# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

PARIS R. BOONE,

               Petitioner,      :     Case No. 2:17-cv-332

   - vs -                               District Judge Algenon L. Marbley
                                          Magistrate Judge Michael R. Merz

ALAN J. LAZAROFF, Warden,
  Mansfield Correctional Institution

                                             :

               Respondent.

# REPORT AND RECOMMENDATIONS

This is an action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Common Pleas Court of Franklin County on January 27, 2014, and sentenced to thirty-seven years to life in prison on one count of aggravated burglary in violation of Ohio Rev. Code § 2911.11, with firearm specification; three counts of aggravated robbery in violation of Ohio Revised Code § 2911.01, with firearm specifications; two counts of aggravated murder in violation of Ohio Revised Code § 2903.01, with firearm specifications; and two counts of attempted murder in violation of Ohio Revised Code § 2903.02, with firearm specifications (Petition, ECF No. 1, PageID 1).

Represented by counsel from the Ohio Public Defender Office, Boone pleads one ground for relief:

> **Ground One:** A courtroom is unconstitutionally closed when some members of the public are excluded without adequate justification. *Waller v. Georgia*, 467 U.S. 39; *Press-Enterprise Company v. Superior Court of California*, 464 U.S. 501.

**Supporting Facts:** Paris R. Boone and Vincent White were tried together on a series of charges related to the shooting of four men at a known drug house. *State v. Boone*, No. 14AP-87, 2015 Ohio App. LEXIS 2545, *1-4. (Ohio Ct. App.). Before the trial began, the court ordered additional security measures because of "the possibility of trying to hijack the courtroom." Tr. 45. This "possibility" was made known to the trial court through conversations with the sheriff's office. Tr. 45-46. The sheriff's office was made aware of the alleged hijacking by an unidentified "witness." Tr. 45.

No hearing took place before the measures were implemented. *Boone* at *9. No witnesses were called and no statements were made under oath regarding the alleged informant. Tr. 45-55. Instead, the intended security measures were explained to trial counsel and the defendants while they waited for the jurors to arrive.
Tr. 45.

To justify the extensive security measures, the trial court noted that Mr. Boone and Mr. White "don't get along safely with other people that are in the jail." Tr. 48. And it pointed to two additional considerations: a previous incident in Cincinnati the week before where a defendant "got nearly beat to death in open court"; and the court's desire not to be "on the front page of Facebook for the next year because something happened in my courtroom." Tr. 47.

Because of its concerns, the trial court effected the following precautions:

- Mr. Boone and Mr. White would be shackled together at the defense table;

- Mr. Boone would be forced to wear a stun belt throughout the trial;

- extra "handpicked" security guards would be placed in the courtroom;

- the front rows of the courtroom behind each table would remain empty; and

- every attendee would be checked in, a warrant check would be run, and individuals with warrants would be arrested.

Tr. 45-55, 435, 537.

Mr. Boone's trial counsel objected. Tr. 50. He objected to the use of the stun belt for health reasons[1]; Mr. White was not required to wear a stun belt because of health reasons. Tr. 50-51. The court overruled the objection. Tr. 52-53.

After four days without incident, Mr. Boone's trial counsel renewed his objection to the stun belt. Tr. 430. He expressed concern that it was "unnecessary" and that it was leading to "a potential of building prejudice and bias against my client." Tr. 435. Specifically, he pointed to the fact that Mr. Boone had asthma and it was exacerbated by the stun belt's restrictiveness. Tr. 430-431. It resulted in so much distress during a key witness's testimony that Mr. Boone needed his inhaler. Tr. 435. Trial counsel argued that Mr. Boone had appeared uncomfortable and nervous as a result of the stun belt, which "could have an effect on the jury." Tr.435.

After the judge stepped off the bench, trial counsel described on the record the effects of the screening and security procedures in place:

> First of all, my people that are here to support my client have been prohibited from coming in the courtroom by being merely minutes late, and they're not allowed to come and go. The prosecutor's witnesses are allowed to come and go. The victim's advocate has come and gone repeatedly throughout these proceedings. The Court has apparently called for S.W.A.T. teams here and has put crime scene tape all over the courtroom, which tends to bias the jury against my client. There's been a plethora—and I do mean a plethora—of law enforcement here.

Tr. 430, 434-435.

These specific concerns were never addressed on the record by the trial court or the State. The trial court overruled the renewed objection regarding the stun belt. Tr. 533. The court elevated the "possibility of a hijacking" into "a conspiracy to basically hijack my courtroom," so it was unwilling to "take any chances." The court declined to remove the stun belt, but did note that law enforcement had loosened it. Tr. 533. This brought with it the added risk that, if activated, it would burn Mr. Boone. Tr. 533.

Ultimately, Mr. Boone was found guilty of aggravated burglary, aggravated robbery, aggravated murder, murder, attempted murder, and felonious assault. He timely appealed to the Tenth District Court

---

[1] Both here, in the Return, and in the Traverse, the parties advert to objections made to the stun belt, which was an issue on appeal. However, no habeas relief is sought related to the stun belt.

3

> of Appeals for Franklin County on multiple grounds, including the denial of his right to a public trial. *Boone* at *4-7. The Tenth District overruled all of Mr. Boone's assignments of error. *Id.* at *32. It held that because the screening procedures did not constitute a closure of the courtroom, there was no error in the court's failure to have a hearing or make the requisite findings. *Id.* at *10-12. It did not address trial counsel's statements that Mr. Boone's supporters were prevented from coming in if they were late and that their exit would bar reentry.

(Petition, ECF No. 1, PageID 15-17.)

# Analysis

Paris Boone was indicted by a Franklin County grand jury August 30, 2012. After conviction by a jury at trial, Boone appealed to the Tenth District Court of Appeals which affirmed. *State v. Boone*, 10th Dist. Franklin No. 14AP-87, 2015-Ohio-2648 (Jun. 30, 2015), appellate jurisdiction declined, 144 Ohio St. 3d 1459 (2016). Boone timely filed his Petition here on April 19, 2017 (ECF No. 1).

On direct appeal, Boone raised as his Fifth Assignment of Error: "The trial court denied appellant his right to a public trial as guaranteed by the Sixth Amendment of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution by closing the courtroom." *Boone*, 2015-Ohio-2648, ¶ 10. It is the federal portion of this Assignment of Error that Boone presents to this Court in his Ground for Relief[2].

Respondent Warden raises no affirmative defenses, conceding that Boone has preserved

---

[2] Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983). Boone does not purport to present an Ohio constitutional question to this Court.

4

this claim for habeas corpus consideration on the merits (Return of Writ, ECF No. 6, PageID 34-35). However, the Warden urges this Court to defer to the decision on this claim made by the Tenth District Court of Appeals. That court decided the Fifth Assignment of Error in conjunction with the First (which concerned use of a stun belt and shackles) as follows:

> **A. Boone's First and Fifth Assignments of Error—Court Security Concerns**
>
> {¶ 12} Because these two assignments of error address the trial court's procedures to ensure the security of the courtroom, we will consider them together.
>
> **1. Shackles and Stun Belt**
>
> {¶ 13} At the beginning of trial, the trial court addressed the issue of courtroom security due to concerns raised by courtroom deputies. Specifically, the trial court noted that an unidentified witness told deputies that White and Boone had discussed "trying to hijack the courtroom." (Tr. 45.) Corporal Davis also described their disciplinary records while in custody, which included violent conduct that caused both White and Boone to be placed in administrative segregation lockdown. Corporal Davis requested that White and Boone wear handcuffs, leg irons, and a belly chain while in the courtroom. The deputies used these restraints to secure the men when they were being moved. (Tr. 48.) Ultimately, the trial court ordered both White and Boone shackled together underneath the table so that the jury would not see the shackles. He also ordered Boone to wear a stun belt. Boone's trial counsel objected to the use of the stun belt for health reasons. The trial court overruled the objection. The trial court did not require either White or Boone to wear handcuffs.
>
> * * *
>
> {¶ 18} Here, even without a hearing, the trial court's reasons for imposing restraints are clear from the record. The trial court was informed of threats the defendants allegedly made about taking over the courtroom during the trial. A deputy also informed the trial court that the defendants had a poor behavioral record while in custody causing them to be placed in administrative segregation. Additionally, there appears to have been an incident between Boone and some spectators during which Boone exchanged words with a

deputy and did not comply with the deputy's order. In light of the circumstances facing the trial court, we cannot say that it abused its discretion in requiring Boone to wear shackles and a stun belt. A trial court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures. *Franklin* at ¶ 79, citing *Loux v. United States*, 389 F.2d 911, 919-20 (C.A.9, 1968).

{¶ 19} Additionally, the trial court exercised its own discretion in determining the least restrictive form of security procedures that would be most appropriate. While the deputy asked for additional steps, the trial court did not agree and refused to order Boone to wear handcuffs. Instead, the trial court ordered shackles and a stun belt and additional security procedures to deal with spectators. Thus, the trial court exercised it own discretion in this regard. *Jackson* at ¶ 158.

**2. The "Closing" of the Courtroom**

{¶ 20} The trial court also stated that an unnamed witness indicated that White and Boone planned to have the courtroom hijacked by outsiders. (Tr. 52.) As a result, the trial court ordered the courtroom deputies to address anyone who came into the courtroom and, apparently, to run warrant checks to determine if anyone had outstanding arrest warrants. Those with warrants would be arrested. During the trial, Boone's trial counsel proffered that Boone's supporters were prohibited from coming in the courtroom if they were late and that they could not come and go as the state's witnesses could. Boone now complains that this amounted to a closure of the courtroom that violated his right to a public trial. We disagree.

{¶ 21} The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Ohio Constitution, Article I, Section 10. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 49-50, 854 N.E.2d 1038, citing *State v. Lane*, 60 Ohio St.2d 112, 119, 397 N.E.2d 1338 (1979). This guarantee is a "cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." *Id.*

{¶ 22} The trial court's actions in dealing with spectators did not amount to a closing of the courtroom for purposes of a public trial analysis. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 100-01, 842 N.E.2d 996. Although Boone claims that his supporters

> were not allowed in the courtroom, the record simply does not support his claim. The courtroom is not closed even though some spectators may choose not to enter because of fear they might be arrested on an outstanding warrant. Accordingly, because the trial court did not close the courtroom, the trial court did not violate Boone's right to a public trial.
>
> {¶ 23} The trial court's procedures to ensure the safety and security of the courtroom and the people inside it were not an abuse of discretion. Accordingly, we overrule Boone's first and fifth assignment of error.

*State v. Boone, supra.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner argues that "clearly established law under the [AEDPA[3]] encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." (Traverse, ECF No. 10, PageID 1479 (alterations in original), quoting *Goff v. Bagley*, 601 F.3d 445, 456 (6th Cir. 2010) (Moore, J.). In *Goff*, a capital case, Judge Moore was in turn quoting from *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (Merritt, J.). In *Taylor* Judge Merritt explained "clearly established":

> The [AEDPA] sets a higher hurdle for those seeking habeas than before, but it does not require that the Supreme Court must have

---
[3] The Antiterrorism and Effective Death Penalty Act of 1996, Pub . L. 104-132, 110 Stat. 1214

previously decided the very case that a lower court has before it. In *Williams v. Taylor*, the Supreme Court warned that "clearly established Federal law, as determined by the Supreme Court" refers to Supreme Court decisions, not those of lower federal courts, and "refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *see also Brumley v. Wingard*, 269 F.3d 629, 637-38 (6th Cir. 2001). At the same time, clearly established law under the Act encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles and standards enunciated in the Court's decisions. As the Court stated, a state court decision makes "an unreasonable application of this Court's precedent" when the court "unreasonably extends a legal principle from our precedent to a new context where it should not apply . . . " but, it is important to emphasize, the Court said at the same time that a lower court also errs when it "*unreasonably refuses to extend that principle to a new context where it should apply*." *Williams*, 529 U.S. at 407 (emphasis added).

288 F.3d at 850-51. Judge Boggs concurred in the judgment but dissented from the majority's interpretation of "clearly established Federal law, as determined by the Supreme Court of the United States," noting

> The opinion does not cite, and I have been unable to find, any Supreme Court case holding that the right to present a defense includes a right to specific jury instructions at all, much less an instruction on any particular ground on which the criminal defendant has offered sufficient evidence to support a jury verdict. The opinion states that this proposition is a rare bird: a fundamental constitutional rule so unexceptional that it has never been drawn into question. This is probably true; however, we are not free to make our own constitutional adjudication. We must find that this fundamental constitutional rule has been clearly established by Supreme Court precedent. It has not been.
>
> This principle does not mean that we can never interpret the contours of a clearly established Supreme Court precedent, nor that the Court must have ruled on exactly this same set of facts. However, to interpret clearly established precedent as resting primarily on "the statement of broad principles and standards," as our court states at page 9, would go too far. This is particularly true when our judgment is based on principles as broad as "our legal heritage" and "the right to present a meaningful defense." (Page 9). At a high enough level

8

> of generality, virtually any result can be derived from principles as broad as "due process" or "the rule of law." If AEDPA is to have any meaning, the phrase "clearly established precedent" must refer to results that logically follow from a Supreme Court decision, not simply holdings that are congruent with, or would be an appropriate extension of, such precedent

*Id.* at 854-55.

Since *Goff* and *Taylor*, the Supreme Court has been more explicit in its own interpretation of "clearly established Federal law": "We have explained that "'clearly established Federal law' for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, 1376 (2015) (per curiam), reversing *Donald v. Rapelje,* No. 12-2624, 580 F. App'x 277 (6th Cir. 2014), and quoting *White v. Woodall,* 572 U.S. ___, ___, 134 S. Ct. 1697, 1702, (2014). The Court continued "To satisfy this high bar, a habeas petitioner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, quoting *Harrington v. Richter*, 562 U.S. 86, 103. To the extent Boone relies on language in Supreme Court precedent which is broader than a holding, this Court is bound by the later narrower Supreme Court interpretations.

**Did the Trial Judge Here "Close" the Courtroom?**

Boone argues the trial court denied him a public trial when it had court personnel identify persons seeking to enter the courtroom and arrest those persons who had an outstanding active arrest warrant. He quotes from the trial judge's comments supporting this action:

> Well, guys, what was relayed to the sheriff's department was you guys were going to hijack the courtroom. Well, you can shake your

9

> head "no," but I'd rather take the chance and make sure it's fair. After what happened in Cincinnati last week when one of the Defendants got nearly beat to death in open court, we're being a little cautious, okay?
>
> Now we're going to leave the front rows empty and basically everyone will be checked coming in, okay?
>
> * * *
>
> I want you guys to get a fair trial, but, on the other hand, I'm not going to be on the front page of Facebook for the next year because something happened in my courtroom, okay?

(State Court Record, ECF No. 6-2, PageID 399-400).

> My issue isn't necessarily with them. My issue is the outer audience, a control thing. The way it was described to me was that there was a pattern engaged into by them to have the courtroom hijacked by outsiders, okay? So I am not going to play with this. Everybody who comes into the courtroom will be addressed by my deputies. If they have warrants on them, they'll be arrested, you know, because we can't have people with warrants on.

*Id.* at PageID 405-06.

The trial judge never held a hearing on the question of security measures to be taken, but acted on information he received from the Sheriff's office. Boone complains that the information was not provided under oath, but there is no requirement that court security personnel provide warnings under oath. The court of appeals made it clear that the judge did not accept *carte blanche* all the recommendations security personnel made – Boone and his co-defendant White were not handcuffed during trial despite a recommendation to that effect. *Boone*, 2015-Ohio-2648, ¶ 19.

Since no hearing was held nor formal findings of fact made, the question is, as the Tenth District framed it, whether what the trial judge did amounted to a closing of the courtroom for Sixth Amendment public trial purposes.

Boone relies first on *Waller v. Georgia* (Traverse, ECF No. 10, PageID 1479, citing 467 U.S. 39 (1984)). In that case, the Supreme Court extended to suppression hearings the public trial right explained earlier the same year in *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"). Georgia had sought to close the suppression hearing because it needed to validate in the hearing evidence seized from wiretaps and that evidence "might involve a reasonable expectation of privacy of persons other than the defendants." 467 U.S. at 41. On that basis, the suppression hearing was ordered "closed to all persons other than witnesses, court personnel, the parties, and the lawyers." *Id.* at 42.

Noting that most of its open courtroom cases had been decided under the First Amendment, the Court noted that the Sixth Amendment was also strongly implicated:

> "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . ."[*Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380 (1979) (internal quotation marks omitted)] (quoting *In re Oliver*, 333 U.S. 257, 270, n.25 (1948), in turn quoting 1 T. Cooley, Constitutional Limitations 647 (8th ed. 1927)).
>
> In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. See *In re Oliver, supra*, at 270, n.24; *Douglas* v. *Wainwright*, 714 F.2d 1532, 1541 (11th Cir. 1983) . . .; *United States ex rel. Bennett* v. *Rundle*, 419 F.2d 599, 606 (3rd Cir. 1969).

*Waller*, 467 U.S. at 46. The Court agreed that those interests proffered by the State of Georgia "may well justify closing portions of a suppression hearing to the public." *Id.* at 48, citing *Press-Enterprise I*, 464 U.S. at 511-12. However, the trial court had closed the entire seven-day hearing, as opposed to the less than 2.5 hours devoted to playing tapes of the intercepted communications. *Id.* at 42. In any event, there is no holding in *Waller* that excluding some identifiable portion of

the public from a trial amounts to a closing of the courtroom for purposes of public trial analysis under the Sixth Amendment.

In *Press-Enterprise I*, a newspaper moved to open voir dire in a capital rape-murder case to the public and press. The trial court, with the concurrence of both the State and the defendant, excluded the press from all but three days of a six-week voir dire in order to further candor by prospective jurors. After trial, the newspaper sought release of the transcript of voir dire and the judge declined, noting that some prospective jurors had revealed sensitive private information during the examination. 464 U.S. at 511. The Court found this interest could be appropriate accommodated by the less restrictive alternative of allowing jurors with sensitive information to convey it to the court and counsel privately. Chief Justice Burger emphasized the public interest in having the press and public present:

> "[The] circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.".
>
> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. We now turn to whether the presumption of openness has been rebutted in this case.

464 U.S. at 509-10, quoting *Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 606-07 (1982). As with *Waller*, there is no holding in *Press-Enterpise I* that excluding some identifiable portion of the public from a trial, other than the press, amounts to a closing of the courtroom for purposes of public trial analysis under the Sixth Amendment.

Petitioner argues *Press-Enterprise* applies here because the opinion states: "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." (Traverse, ECF No. 10, PageID 1480 (emphasis in original), quoting *Press-Enterprise I*, 464 U.S. at 508). That language cannot be taken literally as the holding of the Court, because many people would not be free to attend many trials. If, for example, Boone's co-defendant had been convicted in a separate trial[4] and was already sentenced, he would not have been free to attend. More generally, the word "anyone" includes people who would not be free to attend because they were constitutionally restrained of their liberty, e.g., they had been arrested on an outstanding warrant while attempting to attend.

**Was this Particular "Closure" Justified?**

Petitioner acknowledges that some courtroom closures can be justified (Traverse, ECF No. 10, PageID 1481). He suggests applying the test explicated in *Drummond v. Houk,* 797 F.3d 400 (6th Cir. 2015). In that capital habeas corpus case, the trial court had closed the courtroom to the public, except for the press, during the testimony of three prosecution witnesses. As justification,

> The court explained that one spectator had been disrespectful to deputies and to the court, that another had been charged with assault on a peace officer after an altercation in the courthouse, that some jurors or witnesses felt threatened by some of the spectators, and that Drummond had approached the husband of a potential juror during voir dire.

---

[4] An assignment of error on direct appeal was a claim of prejudicial joinder, so the possibility of a separate conviction is not purely hypothetical.

13

*Id.* at 401. Judge Kethledge's opinion in *Drummond* carefully distinguishes that case from *Waller* and between full and partial closures:

> Unlike this case, *Waller* concerned a full, rather than partial, closure of the courtroom to the public. (By full closure we mean a closure where the entire public, including the media, is excluded from the courtroom.) But the Supreme Court began its analysis by stating a general rule that applies to any type of courtroom closure, to wit: a trial court must balance the interests for and against closure. *See* 467 U.S. at 45. The Ohio courts reasonably (in the habeas sense) applied that general rule here: the trial court offered serious reasons for the closure and tailored its scope in rough proportion to them; and the Ohio Supreme Court affirmed the trial court's decision in an opinion that—agree with it or not—was reasoned and coherent in its application of that general rule.
>
> But *Waller* also laid down a cluster of more-specific rules— "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure"—that the Court held were applicable to the full-closure at issue there. 467 U.S. at 48. Drummond argues that the trial court violated those rules: in his view, the closure in his case was broader than strictly necessary, the court's findings in support of the closure were not as careful and detailed as they should have been, and the court did not make clear the extent to which it considered other alternatives.
>
> Drummond's arguments are by no means frivolous, as our decision today in a direct-review case makes clear. *See United States v. Simmons*, 797 F.3d 409 (2015). But Drummond's case comes to us on habeas review rather than direct. Per the Supreme Court's precedents, therefore, the relevant question is not whether we agree with Drummond's arguments, but whether any "fairminded jurist" could disagree with them. *Woodall*, 134 S.Ct. at 1707. In answering that question, we can consider only the Supreme Court caselaw that was already on the books at the time of the Ohio Supreme Court's decision here. *See Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). (We also note that, contrary to Drummond's assertion otherwise, it is by no means clear that the Court's later decision in *Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010), involved only a partial closure. For in *Presley* the trial court excluded "the public" rather than only a part of it. *Id.* at 210.)

> Drummond's arguments are premised on the assertion that we should extend *Waller*'s more specific rules—in their entirety, with no alteration—from the full closure at issue there to the partial closure at issue here. What was not obvious at the time of the Ohio Supreme Court's decision, however—and thus not clearly established for purposes of the habeas statute—is whether and how these more specific rules apply in cases, like this one, where some spectators but not all are removed from the courtroom. The Supreme Court's caselaw does not clearly establish, for example, whether in such cases the trial court must identify an "overriding" interest favoring closure, as in *Waller*, or instead only a "substantial" interest, as some circuit courts have inferred, or perhaps even some lesser interest. Likewise unclear—and thus not clearly established—is whether the closure must be "narrowly tailored," 467 U.S. at 45, as the Court required in *Waller*, or whether in partial-closure cases a somewhat looser cut will do. And on the procedural side, *Waller* says the court must make "findings adequate to support the closure." *Id.* at 48. But "adequate" is a vague and therefore elastic term; and for all the Ohio courts knew here, "adequate" might mean one thing in full-closure cases, and a different and less rigorous thing when the closure is only partial.

*Id.* at 402-03. Judge Kethledge cites *United States v. Simmons*, relied on by Petitioner[5] as adopting a stricter standard for exclusions from trial, but notes that it is a direct review case, where a lower federal court is authorized to interpret the Constitution directly, as opposed to a habeas case, where we must decide if the state court interpretation was objectively unreasonable.

Petitioner argues that, assuming the *Waller-Press-Enterprise I* rules apply, the exclusion of those with warrants was unreasonable. But Petitioner's trial counsel himself provided an observation that supports the exclusion. He claimed that Boone's "supporters" were being excluded (State Court Record, ECF No. 6-2, PageID 791-92). We have no data about the persons excluded by the trial judge's order. There is no record of who was deterred from trying to enter by having a warrant outstanding or if anyone was actually arrested as part of the process. But if it was in fact Boone's "supporters" as his trial attorney asserted, that supports the trial judge's

---

[5] Traverse, ECF No. 10, PageID 1482.

concern to prevent the presence of persons who might disrupt the proceedings, either by attempting to "hijack" the courtroom or by juror or witness intimidation, surely a valid reason for excluding spectators.

**What Interests Are Sufficient to Justify a Closure?**

Again assuming the *Waller-Press-Enterprise I* rules apply, Boone argues that "a general concern for safety and security would be insufficient to close a courtroom." (Traverse, ECF No. 10, PageID 1482). That is certainly true. He acknowledges the trial judge acted as he did because of a concern about a plan in this case to "hijack the courtroom." *Id.* But he complains that the reliability of the judge's information was "never shown to be anything more than a jailhouse rumor." *Id.* On the contrary, it was shown to be a security risk that the Sheriff's personnel took seriously. Then Boone complains that the order was too broad because it

> [D]id not distinguish between warrants for dangerous crimes and warrants for minor traffic offenses. It did not distinguish between a failure to appear at a child-support hearing and a failure to appear at a sentencing for felonious assault. The relationship between warrants and threats to courtroom security was never explained or justified on the record. But even if that assertion had been made, it would have been easily rebutted.

*Id.* at PageID 1483. Boone then relies, *id.*, on Justice Sotomayor's observations in dissent about the ubiquity of arrest warrants in *Utah v. Strieff,* 136 S. Ct. 2056:

> Outstanding warrants are surprisingly common. When a person with a traffic ticket misses a fine payment or court appearance, a court will issue a warrant. [citation omitted]. When a person on probation drinks alcohol or breaks curfew, a court will issue a warrant. [citation omitted]. The States and Federal Government maintain databases with over 7.8 million outstanding warrants, the vast majority of which appear to be for minor offenses.

*Id.* at 2068 (Sotomayor, J., dissenting). Perhaps from the vantage point of a Supreme Court Justice, the vast majority of arrest warrants are for trivial matters. A trial court judge trying to use probation to restore someone to sobriety probably has a different perspective on the driving under the influence defendant who drinks despite a contrary condition of probation. A single mother with young children has no way besides an arrest warrant to make a deadbeat dad pay up on support Be that as it may, one ineluctable fact distinguishes every person who has an outstanding arrest warrant from every person who does not: judges issue warrants only upon finding probable cause to believe an offense has been committed.[6] No public interest is served by commanding that persons with outstanding warrants be allowed to attend murder trials without first clearing the warrant. Nor does a criminal defendant have any protectible interest in having his "supporters" who have outstanding warrants attend his trial without clearing the warrants.

There is no holding of the Supreme Court that a judge may not bar from the courtroom persons with outstanding arrest warrants. Therefore, the trial judge here was not required by the Constitution to restrict his order to persons with arrest warrants for violent offenses or indeed with prior records for disrupting court proceedings.

**Conclusion**

The decision of the Tenth District Court of Appeals is neither contrary to nor an objectively unreasonable application of clearly established Federal law as embodied in relevant Supreme Court precedent, particularly *Waller* and *Press-Enterprise I.* To obtain an extension of that precedent to the partial exclusion that was ordered here, Boone would have been better advised to

---

[6] Judges who issue warrants without making such a finding have, of course, violated their oath to support and defend the Fourth Amendment.

seek certiorari when the Supreme Court of Ohio declined review. But habeas corpus is not the proper forum in which to obtain extensions of constitutional precedent. Instead, the state courts' decision must be measured against Supreme Court case law at the time the state courts decided the case.

It is therefore respectfully recommended that the Petition be dismissed with prejudice. Because Boone has not cited any jurist who has reached a contrary conclusion, he should be denied a certificate of appealability. However, given the stature of the Ohio Public Defender as an institutional litigator, any appeal should be permitted to proceed *in forma pauperis*.

March 28, 2019.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party=s objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).